674 So.2d 996 (1996)
Dorothy GIBSON, Individually and as Natural Tutor of Her Minor Children
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
AMERICAN MOTORIST INSURANCE COMPANY
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
Nos. 95 CA 1418, 95 CA 1419.
Court of Appeal of Louisiana, First Circuit.
April 4, 1996.
Rehearing Denied June 25, 1996.
*998 William Goforth, Lafayette, for Plaintiff-Appellee Dorothy G. Gibson, etc.
William Doran, Jr., Baton Rouge, for Defendant-Appellant 1st State of Louisiana, DOTD.
David Butler and Keith Armstrong, Baton Rouge, for Intervenor-Appellant 2nd American Motorist Insurance Company, Case No. 275,339Intervenor, Case No. 275, 423 Plaintiff.
Before SHORTESS, PARRO and KUHN, JJ.
KUHN, Judge.
In this survival action and wrongful death lawsuit, the trial court concluded damages were caused by the concurrent liability of the decedent and the defendant, the State of Louisiana, through Department of Transportation and Development ("DOTD"). Fault was apportioned, with DOTD assessed 662/3 *999 percent of fault and the decedent 331/3 percent. We affirm.

FACTS
On March 2, 1983, Vincent Gibson, Sr., was driving on Interstate 10 ("I-10") through St. James Parish in a 1982 Ford tandem-axle truck owned by his employer DRLG Mud Company, Inc. Gibson's vehicle, proceeding in the right lane of traffic, was about to clear Blind River Bridge when the rear of his truck slightly impacted the bridge. The truck veered off to the right, left the roadway, traveled off the shoulder and down the embankment. It impacted a concrete bridge cap adjacent to the roadway, flipped and ignited.[1] As a result, Gibson burned to death.
The concrete bridge cap had been placed by DOTD at the base of the embankment adjacent to the I-10 roadway and shoulder. Shell roads were created during the construction of I-10 to accommodate construction materials which had been barged in by way of the river. Four shell roads clover-leafed around the I-10 roadway and were used by construction trucks to distribute the barged-in materials. At the conclusion of construction, one of the shell roads had been obliterated by the construction company. The other three shell roads remained opened. Local residents would leave the I-10 roadway, drive onto a shell road and fish under Blind River Bridge.
The bridge cap that Gibson's truck crashed into was twenty-eight feet long and in the cross section was a sixteen-inch square. A "Do Not Enter" sign had been placed on the bridge cap by DOTD. The following diagram depicts the roadway, bridge, shell road and the placement of the bridge cap.
*1000 
Dorothy Gibson, Vincent's surviving spouse, filed wrongful death and survival actions on behalf of herself and her four minor children. The petition alleges DOTD, as custodian of the roadway, was negligent in its placement of the concrete bridge cap and/or strictly liable to plaintiffs. Plaintiffs seek damages from DOTD as a result of Vincent Gibson's death.
American Motorist Insurance Company, Inc. ("AMIC"), the workers' compensation insurance carrier for DRLG Mud Company, Inc., paid death benefits to plaintiffs, as well as other items of damages to the employer. AMIC filed a separate lawsuit against DOTD to recover damages in subrogation. The two lawsuits were consolidated.
The trial court concluded plaintiffs' damages were caused by the concurrent negligence of the decedent and DOTD. In apportionment of fault, DOTD was held to be 662/3 percent at fault, and decedent was determined to be 331/3 percent at fault. The trial court awarded $50,000 for the survival action. In addition, Dorothy Gibson was awarded $350,000, and the four Gibson children were awarded $200,000 each for wrongful death damages. Lost wages were also awarded in the amount of $212,287. The trial court awarded $93,480, the amount stipulated by the parties, to AMIC on its subrogation claim. Each of the damage awards was reduced by 331/3 percent (the percentage of fault *1001 assessed to Gibson). A judgment was signed on February 6, 1995. From this judgment, all parties have appealed. DOTD asserts the trial court erred in its determination that DOTD is liable. All parties challenge the trial court's apportionment of fault. DOTD maintains the trial court erred in its assessment of damages.

LIABILITY OF DOTD
DOTD's liability to a plaintiff may arise under a theory of negligence, La.Civ. Code art. 2315, or a theory of strict liability, La.Civ.Code art. 2317. Hunter v. Dept. of Transp. & Dev., 620 So.2d 1149, 1150-1151 (La.1993). Although the two theories constitute separate and distinct avenues of relief for damages resulting from a dangerous condition on land, the two theories are similar. Under either theory, plaintiff must prove (1) the thing which caused the damage was in the custody of the defendant; (2) the thing contained a "defect" (i.e., it had a condition that created an unreasonable risk of harm to the plaintiff); and (3) the "defective" condition of the thing caused the injuries. In essence, the only difference between the negligence theory of recovery and the strict liability theory of recovery is the plaintiff need not prove the defendant was aware of the existence of the "defect" under the strict liability theory. Under the negligence theory, it is the defendant's awareness of the dangerous condition of the property that gives rise to a duty to act. Under a strict liability theory, it is the defendant's legal relationship with the property containing a defect that gives rise to the duty. Oster v. Dept. of Transp., & Dev., 582 So.2d 1285, 1288 (La.1991). Under either a strict liability or a negligence theory of recovery, the liability of DOTD to an injured plaintiff hinges on whether it has breached a duty to plaintiff. Hunter, 620 So.2d at 1150.
We note a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, the reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d at 844.

A. Custody
In holding DOTD liable for a portion of plaintiffs' damages, the trial court implicitly determined the right of way and the concrete barrier into which Vincent Gibson crashed were in the care, custody and control of DOTD. The parties have not assigned error with this finding. Therefore, it is undisputed that the right of way and the concrete bridge cap were in the care, custody and control of DOTD when the accident occurred.

B. Defect
The trial court determined DOTD's placement of the bridge cap constituted a defect. DOTD asserts there is no evidence of a defective condition which caused Gibson's truck to leave the roadway and, therefore, it cannot be held liable to plaintiffs. The trial court concluded the land on which a portion of the bridge cap was located lies within the I-10 right of way and clear zone. The glossary of the American Association of State Highway and Transportation Officials' ("AASHTO") "Guide for Selecting, Locating, and Designing Traffic Barriers" publication (1977 Edition) defines a clear zone in relevant part as: "[t]hat roadside border area, starting at the edge of the traveled way, available for use by errant vehicles."[2] In this case, DOTD takes the position that the clear zone is a thirty foot zone adjacent to the roadway.
Duaine T. Evans, accepted as an expert in the field of traffic engineering, testified on behalf of plaintiffs. Evans explained the purpose of the clear zone was to provide a safety zone for drivers who may run off the highway, and the higher the operating rate of speed on the roadway, the wider the *1002 clear zone needs to be. According to Evans, this is because the higher the rate of speed, the greater distance vehicles travel when they leave the roadway. In Evans' opinion, there was no justification whatsoever for placing the concrete bridge caps in the clear zone. He stated the clear zone should be kept as free of obstructions as possible to permit a vehicle access to the area in an emergency. Evans testified the clear zone was provided for use by people like Gibson.
In Evans' opinion, DOTD could have more effectively accomplished their goal of deterring local traffic from using the shell roads (without incurring any additional cost) simply by locating the concrete bridge caps closer to the bridge end of each of the shell roads, at an angle perpendicular to the roadway. Evans described several additional alternatives which DOTD could have utilized in its effort to deter use of the shell roads. These included digging trenches across the shell roads and obliteration of the shell roads by plowing and seeding. Evans also suggested DOTD could have requested law enforcement officials to patrol the area occasionally, issue citations and tow vehicles using the shell roads.
According to Evans' testimony, placement of the bridge caps in the location chosen actually made exiting and re-entering I-10 from the shell roads more difficult and dangerous because the driver would have to make a sharper, more perpendicular turn to get back onto I-10 and, therefore, would be climbing up the slope of the embankment rather than going parallel with it. He pointed out DOTD's installation of the bridge caps created a greater hazard to motorists driving on I-10 because as local traffic re-entered the roadway they could not accelerate and pick up speed as easily as if no barrier were present.
Olin K. Dart, accepted as an expert in traffic engineering, highway design and accident reconstruction, testified on behalf of DOTD. Dart explained the cleared area adjacent to the roadway is available for the safety of vehicles that run off the road. He acknowledged the clear zone was provided to reduce the risk to errant drivers losing control for any reason and was for the benefit of any driver, including Gibson.
Dart conceded the concrete bridge cap could have been placed in a better location where it would have blocked the road effectively and denied access to local traffic. He explained that in a different location the bridge cap would not have become a roadside obstacle for errant vehicles leaving the roadway. Dart testified he would have placed a barrier back by the bridge, and suggested use of either a wooden barricade or a chain link fence. He agreed with Evans that obliteration of the shell roads and use of local law enforcement agencies were safer alternatives available to accomplish DOTD's goal of denying local traffic access to the shell roads. Dart acknowledged that after the placement of the bridge caps, access to the shell roads was not seriously impeded, stating that in terms of the entire length of the shell road, only a very small portion of the road was blocked.
Louisiana State Police Trooper Steven T. Jones was dispatched to the accident site on March 2, 1983. Jones described the terrain of the general area as swamp land. He stated based on his investigations of vehicles running off the roadway in similar terrain, usually the vehicle will tear down a whole bunch of trees and do pretty good damage to the vehicle, but the driver is not seriously injured. Jones understood the edge of the road up to the tree line was a safety area to permit drivers to take evasive actions and corrective measures, and then safely re-enter the roadway. He believed the concrete bridge cap, as placed, was a hazard. Jones felt he would have had no problem driving his patrol car down onto the shell road, despite the presence of the concrete bridge cap as placed by DOTD. He thought a four-wheel drive vehicle could have accessed the shell road even easier than his patrol car.
Louisiana State Police Trooper Danny R. Baxter was also present at the accident site. He testified he did not think the concrete bridge cap had a purpose and that it had simply been stored off the roadway. Baxter agreed with Jones, stating the concrete bridge cap, as placed by DOTD, was a major hazard. Baxter explained that unless vehicle dynamics or the presence of something *1003 causes a car to flip or a person to be ejected, he would not have expected an accident to result in a fatality in this type of terrain.
Carroll Phillips, a maintenance supervisor for DOTD in 1983, testified he was responsible for the roadway condition and the right of way adjacent to the Blind River Bridge portion of I-10. He explained the purpose of and the process involved in the placement of the concrete bridge caps, stating that prior to their placement nothing blocked off the shell roads. Phillips recalled receiving a complaint from Lieutenant Ray Farris of the Louisiana State Police advising of the hazard created by the traffic exiting and re-entering I-10 to use the shell roads, and conceded DOTD knew it was an "apparent problem." Because Phillips' office was located in a yard which contained excess materials including numerous bridge caps, Phillips suggested use of the bridge caps to accomplish DOTD's objective of denying access to local traffic.
According to Phillips' testimony, he lacked the necessary manpower within his supervision to move the concrete bridge caps. Instead, the foreman of a district-wide crew placed the bridge caps across the shell roads. Phillips stated he instructed the foreman to place each bridge cap a minimum of thirty feet from the edge of the traveled portion of the I-10 roadway. He explained the site he chose was visible from the roadway and, therefore, he felt would be more effective at deterring local traffic from using the shell roads. Although Phillips felt local traffic was effectively deterred after the placement of the bridge caps, he admitted vehicles with four-wheel drive could continue to access the shell roads. He acknowledged that despite DOTD's efforts to obliterate the shell roads, after a rainfall they showed again. Phillips did not inspect the location of the concrete bridge caps subsequent to placement.
After reviewing the evidence and considering the facts of this case, we cannot find the trial court was clearly wrong in concluding the bridge cap, as placed by DOTD, presented an unreasonable risk of harm and, therefore, constituted a defect. The evidence shows the bridge cap was not of great utility in deterring local traffic from using the shell roads. Furthermore, the placement of the bridge cap presented a significant hazard to motorists traveling on I-10 who leave the roadway.

C. Cause-in-Fact
DOTD asserts because it did nothing to cause Gibson to leave the I-10 roadway, it should be found free from fault. Essentially, DOTD contends its placement of the bridge cap was not the cause-in-fact of the resulting harm to Gibson. DOTD would have us look no further than the negligence of Gibson in causing the accident. However, the failure of Gibson to maintain control of his vehicle does not relieve DOTD of its duty to keep highways safe. See Campbell v. Louisiana Dept. of Transp. & Dev., 94-1052, pp. 6-7 (La. 1/17/95), 648 So.2d 898, 902. This case involved one unfortunate event, a collision of a vehicle with a concrete bridge cap. The negligence of Gibson in losing control of his vehicle as well as DOTD's placement of the concrete bridge cap combined to cause the harm to Gibson. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. Campbell, 94-1052, at 7, 648 So.2d at 902. Clearly, DOTD's placement of the concrete bridge cap was a cause of Vincent Gibson, Sr.'s death. Therefore, we find no manifest error in the trial court's conclusion that DOTD is liable to the plaintiffs for a portion of the damages sustained.

GIBSON'S FAULT
Plaintiffs and AMIC assert the trial court erred in assessing any fault to Vincent Gibson. They contend the evidence shows Gibson was reacting to the loss of a portion of the load of drilling mud, which had been placed in the company-owned truck by Gibson's co-employee in Hopedale, and maintain there is no evidence of any negligence on Gibson's part.[3]
*1004 It is well settled that the assessment of comparative negligence is a factual matter within the sound discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d 836, 840-841 (La.App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993).
The trial court concluded Vincent Gibson, Sr., was partially at fault for contributing to his injuries. In assessing such fault, the trier of fact recognized Gibson initially caused the accident by veering off the highway and that he had the last clear chance to avoid it. Plaintiffs and AMIC urge the trial court erred in its application of last clear chance to the facts of this case.
Prior to the adoption of comparative fault in Louisiana, the doctrine of last clear chance was created to escape the harsh effects of the contributory negligence defense which, in its strict application, operated as an absolute bar to a plaintiff's recovery. See Baumgartner v. State Farm Mut. Auto. Ins. Co., 356 So.2d 400, 403 (La.1978). In a comparative fault analysis, whether the plaintiff had the last clear chance to avoid an accident is a determination for the trier of fact. In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the court explained the appropriate considerations for a comparative fault analysis, as follows:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson, 469 So.2d at 974. Thus, the principles considered in the application of the last clear chance doctrine are subsumed by the comparative fault analysis. The application of the last clear chance doctrine is not, therefore, a separate consideration for the trier of fact.
Since the advent of comparative negligence, drivers straying off the roadway have been found comparatively at fault. See Hood v. State, Dept. of Transp. and Dev., 587 So.2d 755, 760 (La.App. 2d Cir.), writs denied, 590 So.2d 81, 82 (La.1991); Rochelle v. State, Dept. of Transp. and Dev., 570 So.2d 13, 17 (La.App. 3d Cir.1990), writ denied, 572 So.2d 93 (La.1991); Cashio v. State, Dept. of Transp. and Dev., 518 So.2d 1063, 1065 (La. App. 1st Cir.1987).
There is ample evidence in the record to support the trial court's determination that Gibson was negligent because he failed to maintain control of his vehicle, even if he had faced a potential loss of a portion of his load. Earl Picard, accepted as an expert in accident reconstruction and in training truck drivers, testified on behalf of the plaintiffs. Picard stated if a driver develops a loose load problem, truck safety requires the driver to slow down and to pull over to the side of the roadway. He explained a driver ought not to apply too much pressure to the brakes of the vehicle because a sudden stop would cause the load to continue to fall.
DOTD's expert Dart also testified regarding the appropriate response of a professional truck driver incurring a problem with loss of a portion of his load. Dart explained once the driver realizes he has a problem, he should immediately maneuver his vehicle to the shoulder, stop and secure the load before continuing on his journey. He stated the purpose of the shoulder was for emergencies such as loss of a portion of a truck driver's load.
Joseph Guidry, Gibson's co-employee and fellow professional truck driver, testified that if a driver notices something is wrong with his load, or part of his load is coming loose when he is traveling down the road on a bridge like the Blind River Bridge, he should slow down and pull off to the side. He stated the driver should get as far off the travel portion of the roadway as possible. Guidry acknowledged the asphalt shoulder adjacent to the I-10 roadway was wide *1005 enough for Gibson's truck to get off the roadway.
The record contains no evidence indicating why Gibson left the roadway. In light of Gibson's breach of his duty to maintain control of his vehicle and, having failed to establish the reason Gibson's conduct did not conform to the duty of a professional truck driver responding to a loose load, we cannot say the trial court was clearly wrong or manifestly erroneous in concluding Gibson was partially responsible for the injuries he sustained.

APPORTIONMENT OF FAULT
The trial court's allocation of fault is initially subject to the manifest error rule. Reid v. State Through Dept. of Transp. & Dev., 25, 778, p. 9 (La.App. 2d Cir. 5/4/94), 637 So.2d 618, 624, writ denied, 94-1415 (La. 9/16/94), 642 So.2d 198; See Clement v. Frey, 95-1119, 95-1163, p. 7 (La. 1/16/96), 666 So.2d 607, 610. In apportioning fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Campbell, 92-1052 at 7; 648 So.2d at 902.
The trial court assessed Gibson 331/3 percent of fault for failing to retain control of his vehicle and determined DOTD was 662/3 percent at fault for its placement of the concrete bridge cap. The trial court specifically found the location of the bridge cap as placed by DOTD probably made "this otherwise minor accident fatal." All parties challenge the trial court's allocation of fault.
If we analyze the fault of the parties in causing the harm to Gibson, then it is clear the greater degree of fault lies with DOTD. We reach this conclusion through the application of traditional comparative fault considerations. When considering the fault of the parties in causing the harm to a plaintiff, the trier of fact must consider both the nature of the conduct of each party and the extent of the causal relation between the conduct and the damages claimed (i.e., the harm), as discussed in Watson and Campbell. We note both considerations, conduct and harm, are not new to a comparative fault determination but represent the traditional legal precepts of comparative fault.
Except to the extent Gibson's negligence set the accident in motion, he had no control over the resulting harm caused by the impact with the concrete bridge cap. See Campbell, 94-1052 at 7; 648 So.2d at 902. However, DOTD, having placed the bridge cap, was clearly aware of the presence of the bridge cap off the roadway and knew, or should have known, of the risk to motorists using the I-10 roadway. The testimony of State Troopers Jones and Baxter regarding their experiences in investigating motor vehicle accidents in similar terrain supports the trial court's allocation of fault. Each explained that while damage to the vehicle could be expected, usually the driver would not be seriously injured. The evidence shows that with little or no additional financial expenditure, DOTD could have easily accomplished its goal of deterring use of the shell roads by simply placing the bridge cap in a different location. Accordingly, we find the trial court was not clearly wrong or manifestly erroneous in its allocation of fault.

DAMAGES
DOTD urges the trial court erred in its assessment of damages in the survival action and in each of the wrongful death awards. Insofar as the survival action, DOTD maintains because no evidence shows Vincent Gibson, Sr., had any awareness or pre-impact fear this item of damages should be disallowed. With regard to the wrongful death damages, DOTD requests a reduction of each award.
The trier of fact is given much discretion in the assessment of damages. La. Civ.Code art. 2324.1. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993).

A. Survival Action
A trial court is within its much discretion in awarding damages for pain and suffering in a survival action where there is the smallest amount of evidence of pain on *1006 the part of the deceased, by his actions or otherwise, and factors to be considered in assessing quantum for pain and suffering are the severity and the duration thereof. Hampton v. Rubicon Chemicals, Inc., 579 So.2d 458, 469 (La.App. 1st Cir.1991).
The evidence shows Vincent Gibson, Sr., was forty-one years old when he died. Dr. Richard Tracey, the pathologist who performed the autopsy on Gibson, testified the decedent's body was severely burned. He explained that all parts of Gibson's body were burned with the arms and legs totally burned away. He stated the portion of the body remaining was completely charred. Although the internal organs had been altered by the heat, Dr. Tracey was able to perform an examination of them. Dr. Tracey concluded it was more probable than not Gibson was alive while the vehicle was burning. He could not give an opinion as to the duration of time Gibson was alive during the fire, but believed it could have been several minutes.
Plaintiffs' expert Picard concluded Gibson had control of his vehicle to some extent after it initially impacted with Blind River Bridge because when the right front wheel dropped onto the grass, a vehicle would have a tendency to pull to the right due to the drop from the shoulder of the roadway to the grassy area and the location of the roadway on an embankment. Since the tire tracks indicated Gibson's vehicle followed a fairly straight line, Picard believed it showed Gibson's consciousness prior to impact with the concrete bridge cap.
The trial court in awarding $50,000 to plaintiffs for the survival action stated, "Mr. Gibson must have died upon or relatively shortly after this fiery impact. The suffering he endured, though intense, was mercifully brief." Based on the foregoing, we cannot say the trial court abused its much discretion in awarding $50,000 for the survival action.

B. Wrongful Death
The elements of damage for a wrongful death action are loss of love, affection, companionship, and support and funeral expenses. Hampton, 579 So.2d at 469.

1. Dorothy Gibson
Vincent and Dorothy Gibson were married for twelve years and they had three sons. Their fourth son was born eight days after Vincent's death. The evidence shows the Gibsons were a close family. Vincent Gibson, Sr., spent a lot of time with his wife and sons. Dorothy was proud of her husband's military record. She testified that when he returned from Vietnam, she and Vincent built the house where they raised their sons and in which she continues to live. Dorothy stated her husband helped her with the children and attended to the yard. She reminisced about vacations the family used to take while Vincent was alive and said she did not do that since he died. When Dorothy learned of Vincent's death, she apparently went into shock and had to be taken to the hospital. At the time of trial Dorothy had not remarried and stated, without Vincent in her life, she felt she had no future. According to Dorothy, the worst thing that had happened in her life was Vincent's death. Her sons believe she has never recovered from the death of their father. Because she has been seen crying for no apparent reason, the sons attribute it to her continuing grief over the loss of their father.
The record shows the loss of Vincent Gibson, Sr., has been overwhelming to Dorothy. Accordingly, we find the trial court did not abuse its discretion in awarding $350,000 to Dorothy Gibson in her wrongful death action.

2. Minor children
Each of Vincent and Dorothy Gibson's four sons testified. Vincent Gibson, Jr., who was twelve years old when his father died, explained the difficulty he had reconciling the loss of his father because, due to the severity of burns to the body, the casket at the funeral was closed. Vincent said his father had helped him with his homework, attended wrestling matches, took him out to visit relatives and was teaching him how to drive when the accident occurred. He stated before his father's death he wanted to pursue a military career, like his father had, but he abandoned his idea of a career in the military to stay at home and provide support to his mother and three younger brothers. Joseph Brad Gibson, who was nine years old when *1007 his father died, recalled similar excursions with his father as those described by Vincent. He stated before his father's death he wanted to pursue a career in truck driving. He could not imagine making his living in that manner subsequent to his father's death. John Mark Gibson was four years old when his father died. Gary Lee Gibson, who was born subsequent to his father's death, described how he felt left out when other family members discussed their father. He stated he really wishes he had a father to spend time with him.
We have carefully reviewed the entire record and find the evidence establishes the Gibsons were a close and loving family. The four Gibson sons have had to grow up without their father. Vincent Gibson, Jr., has had to assume some of the duties which his father would have otherwise provided. Accordingly, we find the trial court did not abuse its discretion in awarding the four Gibson sons $200,000 each in this wrongful death action.

CONCLUSION
For the reasons expressed herein, the judgment of the trial court is affirmed. DOTD is cast with appeal costs in the amount of $2,621.04.
AFFIRMED.
NOTES
[1] The evidence shows a mound of dirt was in the vicinity of the concrete bridge cap. Because there is no evidence establishing the placement of the mound of dirt was a factor in the accident, we limit our discussion to the installation of the concrete bridge cap.
[2] See La.R.S. 48:35 (stating DOTD shall adopt minimum safety standards with respect to highway design, construction and maintenance and that these standards shall correlate with and, so far as possible, conform to the current system as approved by AASHTO).
[3] Plaintiffs and AMIC urge application of the sudden emergency doctrine to exonerate Gibson from any finding of fault. The only explanation offered by plaintiffs for why Gibson left the roadway (i.e., his load suddenly became loose) was not established by a preponderance of the evidence. Therefore, we conclude the doctrine of sudden emergency does not apply to the facts of this case.