707 So.2d 1240 (1998)
Maurio BROWN
v.
LOUISIANA INDEMNITY COMPANY, et al.
Willie BALLARD
v.
LOUISIANA INDEMNITY COMPANY, et al.
Jesse GREEN, Jr.
v.
LOUISIANA INDEMNITY COMPANY, et al.
No. 97-C-1344.
Supreme Court of Louisiana.
March 4, 1998.
Rehearing Denied April 3, 1998.
*1241 Daniel G. Brenner, Bolen & Erwin, Alexandria, for Applicant.
Kenneth P. Fuselier, Oakdale, Paulin J. Laborde, Jr., Lake Charles, Joffre W. Fusilier, Ville Platte, and David W. Robertson, Baton Rouge, for Respondent.
MARCUS, Justice.[*]
This case arises out of a single-car accident on Highway 10 in Evangeline Parish, Louisiana. Two passengers were seriously injured and one was killed. Maurio Brown and Jesse Green, the surviving passengers, filed separate suits to recover damages for the personal injuries they sustained. Elaine and Willie Ballard filed a wrongful death action to recover damages arising out of the death of their son, Sean Brunson Ballard. Various parties were named as defendants, including Reginald Taylor, the driver of the vehicle, his insurer, Champion Insurance Company,[1] and the State of Louisiana through the Department of Transportation and Development (DOTD).[2] The three suits were consolidated for trial.
In the early morning hours of March 11, 1989, Taylor, Ballard, Brown and Green were traveling west along Highway 10 towards Oakdale. The young men were on their way home after an evening of dancing in Ville Platte. Ballard, Brown and Green slept while Taylor drove his brother's borrowed 1978 Datsun 280ZX sports car. It is undisputed that Taylor was not intoxicated at the time of the accident. Approximately six miles east of Oakdale, Taylor's vehicle left the paved portion of the highway while traversing a 733 foot, banked, left-hand curve. Taylor's vehicle traveled thirty-nine feet along the eight-foot-wide, aggregate shoulder and thirty feet through the ditch before striking a driveway and becoming airborne. From that point, the car traveled fifty-one feet, struck a pine tree and continued until hitting a second pine tree, where the car was severed in half. No skid marks or brake marks were found at the point where Taylor's vehicle left the pavement. The cause of the accident is in dispute. Plaintiffs contend that, after having negotiated approximately fifty-one percent of the curve, Taylor negligently let his right tires drift onto the shoulder. Due to an excessive shoulder slope and the presence of an abandoned driveway, plaintiffs claim that Taylor's vehicle was pulled off the road and then propelled towards the pine trees. DOTD contends that Taylor was either sleeping or otherwise distracted at the time his car left the highway.
*1242 Because his car was traveling at a speed of fifty-five to sixty miles per hour, DOTD claims that Taylor had traversed both the shoulder and the ditch before he ever had an opportunity to react. Consequently, DOTD argues that the shoulder slope was not a significant factor in causing plaintiffs' injuries. Furthermore, DOTD asserts that it has no duty to maintain the abandoned driveway and, in the alternative, that the driveway did not contribute to the harm occasioned by plaintiffs.
After trial on the merits, the judge determined that the negligence of the driver in running off the road, together with DOTD's negligence in failing to maintain a proper shoulder slope and in failing to conform the abandoned driveway to the shoulder, combined to cause the accident and the resulting damages. The judge apportioned 25% of the fault to Taylor and 75% to DOTD and awarded damages to the plaintiffs. DOTD appealed. The court of appeal affirmed, adopting the trial judge's factual findings. Upon DOTD's application, we granted certiorari to "consider DOTD's fault."[3]
In order for DOTD to be held liable under the circumstances of this case, the trial judge must have concluded (1) that DOTD had custody of the thing which caused plaintiffs' damages, (2) that the thing was defective because it had a condition which created an unreasonable risk of harm, (3) that DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) that the defect was a cause-in-fact of plaintiffs' injuries. Lee v. State, Through Dep't of Transp. & Dev., 97-0350, p.3-4 (La.10/21/97), 701 So.2d 676, 677-78.
It is undisputed that DOTD has custody of Hwy 10 where Taylor's vehicle left the road. DOTD has a duty to maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. La. R.S. 48:21(A); Campbell v. Dep't of Transp. & Dev., 94-1052 (La. 5), 648 So.2d 898, 901. This duty extends to the shoulders of highways as well. Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1172 (La.1986); Rue v. State, Dep't of Highways, 372 So.2d 1197,1199 (La.1979). The highway department's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder. Rue, 372 So.2d at 1199. Whether DOTD breached its duty to the motoring public, by knowingly maintaining a defective or unreasonably dangerous shoulder, depends on the facts and circumstances of the case. Lee, 97-0350, p.4 (La.10/21/97), 701 So.2d at 678.
La. R.S. 48:35(A) requires DOTD to "adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance." The statute further mandates that these standards "correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [AASHTO]." John LeBlanc, DOTD's district maintenance engineer, testified at trial that, in addition to following the standards set by AASHTO, DOTD has promulgated three manuals which regulate the maintenance of state roadways, shoulders, ditches and bridges. According to the guidelines set forth in these materials, LeBlanc testified that a parish maintenance superintendent is required to inspect all of the roads at least once every two weeks for signs of deterioration and disrepair. Michael Napoli, the maintenance superintendent for Evangeline Parish, testified that he drives the roads himself looking for deficiencies on the travel lanes, shoulders and ditches. Napoli claimed, however, that throughout his inspections he seldomly refers to DOTD's Maintenance and Maintenance Standards Manuals. Although shoulder work is performed on an as needed basis, Napoli testified that he is unaware of any standards dictating the proper slope at which the shoulder should be maintained. Further, Napoli revealed that the road repair crew under his supervision receives no formal training but rather learns from other workers while on the job. Thomas Thompson, a member of Napoli's crew, *1243 confirmed that he does not blade the shoulders on a particular slope but rather maintains them at an angle sufficient only to provide proper drainage.
Plaintiffs' experts, Duaine Evans and James Justice, testified at length about the defective shoulder along Hwy 10 at the scene of the accident. The defect of primary importance in this case is the excessive slope of the shoulder where Taylor's vehicle left the paved surface of the road. According to Justice, an expert in roadway design, DOTD's 1965 reconstruction plans called for the shoulder to be level with the asphalt surface throughout the banked portion of the curve. There is no evidence to suggest that the road and shoulder were not reconstructed according to these plans. Nevertheless, based on surveys of the area conducted after the accident, the experts presented shoulder slope measurements ranging from .01 to .09 feet per foot. This means that, over an eight foot shoulder, there is a drop of anywhere between one inch and 8.64 inches. Evans and Justice agreed that, the steeper the slope, the greater the centrifugal pull away from the hard surface of the road. At the point where Taylor apparently left the pavement, Justice claimed that the slope of the shoulder is approximately .04 feet per foot or 3.84 inches. Given this negative slope, which is well in excess of that envisioned by DOTD's 1965 plans, plaintiffs' experts testified that Taylor had virtually no chance of recovery from the moment his front tire hit the shoulder.
In addition to the excessive shoulder slope, Evans, a traffic engineer and accident reconstructionist, calculated that the westbound travel lane of Hwy 10 has a positive slope of between .068 and .09 feet per foot. In other words, throughout the banked portion of the curve, the asphalt surface slopes away from the shoulder at a rate of 8.16 to 10.8 inches every ten feet, the width of a travel lane. According to standards set forth by both DOTD and AASHTO, the maximum slope permitted at a highway's roll over point is .07 or .08 feet per foot.[4] The roll over or break over is the point at which the travel portion of the highway meets the shoulder. Evans testified that, when the left tires of a vehicle are on a downward slope to the left (highway) and the right tires are on a downward slope to the right (shoulder), the result is instability. Evans measured the actual slope at the roll over near the scene of the accident to be between .12 and .167 feet per foot, almost double that permitted under DOTD and AASHTO standards. Justice and Evans testified that the centrifugal force created by an excessive shoulder slope, combined with the instability created by an excessive roll over, presents an unreasonably dangerous condition for motorists. Plaintiffs' experts testified that the effect of this dangerous condition was to pull Taylor's vehicle away from the travel lane and towards the ditch. Consequently, in their opinion, the condition of the shoulder along Hwy 10 was a contributing factor to the accident.
Dr. Joseph Blaschke, an expert for DOTD in the fields of highway design, traffic engineering, and accident reconstruction, disputed the testimony of plaintiffs' experts at trial. Although he never took any measurements at the scene of the accident, Blaschke testified that the slopes along Hwy 10 are very gentle. He claimed that a sports car, like the one driven by Taylor, has a low center of gravity. While a large truck may become unstable on a roll over of .12 to .167 feet per foot, Blaschke stated that a sports car is not likely to go out of control. Furthermore, Blaschke claimed that the amount of centrifugal force generated by a vehicle on a gradual curve such as this is not sufficient to pull it off the roadway. According to Blaschke, if Taylor's vehicle was traveling at a speed of fifty-five to sixty miles per hour, it would have traversed over eighty feet per second. Because an alert, unimpaired driver takes one to one and a half seconds to react, Blaschke doubted that Taylor had an opportunity to respond until he had crossed both the shoulder and the ditch. Blaschke noted that there were no brake marks or other evidence to suggest that Taylor attempted to get back on the road. Thus, Blaschke testified that the sloping *1244 condition of the shoulder had little, if any influence on Taylor's accident.
Based on this conflicting testimony, the trial judge found that the slope of the shoulder along Hwy 10 poses an unreasonable risk of harm to motorists and, therefore, renders the shoulder defective. Furthermore, the trial judge found that this defect was a contributing cause of Taylor's accident. Since there is a reasonable factual basis for the findings of the trial judge, we cannot say that he was clearly wrong in holding that the slope of the shoulder was defective and that it was a contributing cause of the accident.
We must reject, however, the trial judge's determination that DOTD is responsible for any contribution the abandoned driveway may have had to plaintiffs' harm. Plaintiffs offered testimony that the driveway forms a hump at the point where it abuts Hwy 10 and that the entrance to the drive is blocked by high grass, bushes and debris. As a result of these obstructions, plaintiffs contend that the shoulder in front of the driveway is not safe to motorists. According to the testimony of Trooper Michael Ardoin, the investigating officer, after leaving the pavement, Taylor's vehicle traveled thirty-nine feet over the shoulder and thirty feet through the ditch before striking the driveway. It appears, therefore, that Taylor's car hit the driveway some distance from the place at which it joins the road and that his car never came into contact with either the hump or the bushes and debris. Consequently, we find insufficient evidence to support the trial judge's finding that the condition of the shoulder where it meets the drive was a contributing cause of the accident. Further, no evidence was presented at trial to suggest that DOTD has custody of the driveway. In fact, although the driveway is repeatedly referred to as "abandoned," witnesses testified that it is situated on private property and that it has simply deteriorated due to years of non-use. Without passing on the issue of custody, it is clear that any duty DOTD has with regards to the private driveway does not encompass the risk that a motorist will encounter it while traveling through the ditch. Therefore, the trial judge was clearly wrong in finding DOTD liable for any contribution the private driveway may have had to plaintiffs' harm.
Finally, the evidence shows that the trial judge was not clearly wrong in finding that DOTD had actual or constructive notice of the defective shoulder. While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to discover that which is easily discoverable. Both John LeBlanc and Michael Napoli testified that the highway department is required to conduct bi-weekly roadway inspections. Although the shoulder at the scene of the accident is supposed to be level with the paved travel lane, none of the measurements taken by plaintiffs' experts conform to this requirement. Had Napoli been familiar with DOTD's maintenance manuals and the shoulder slope standards set by AASHTO, he should have recognized the dangerous condition of the shoulder at the scene of the accident. Moreover, Ervin Willis, who lived near the accident scene, testified that he called both the Evangeline Parish DOTD unit and the office in Baton Rouge to try to get the road and shoulder fixed prior to the date of the accident. As far as he knew, no corrective action was ever taken in response to his calls. However, Willis claimed that, prior to the accident, DOTD put some ground-up asphalt on the shoulder, demonstrating a recognition of the drop off along the curve. Other residents living along Hwy 10 at the time of the accident testified that the shoulders had been in poor condition for years. Both Ervin Willis and Thomas Doyle, another area resident, claimed that, on occasion, they had been forced to haul sand and gravel to level portions of the shoulder which dropped off in front of their residences. Given the apparent length of time for which the highway shoulder remained in disrepair, there was sufficient evidence for the trial judge to conclude that DOTD either had actual or constructive notice of the dangerous condition and that DOTD had ample opportunity to take corrective measures but failed to do so.
Based on our review of the record, we cannot say that the trial judge was clearly wrong in finding DOTD liable to plaintiffs for the injuries they sustained.
*1245 Neither side disputes that Reginald Taylor was negligent and that his negligence was a substantial cause of plaintiffs' injuries. As a driver, Taylor has a duty, which he breached, to use reasonable care in the operation and control of his vehicle. Encompassed within the scope of this duty is the risk that guest passengers might be injured in an accident. Molbert v. Toepfer, 550 So.2d 183, 184 (La.1989). At trial, several witnesses testified that Taylor told them he may have fallen asleep immediately prior to the accident. Dr. Blaschke claimed that the path of Taylor's vehicle off the road, together with the absence of any skid marks, is consistent with this theory. Plaintiffs' experts, on the other hand, argued that Taylor would not have successfully negotiated fifty-one percent of the curve had he been sleeping. Although Taylor admitted that it is possible he dozed off, he recalled being alert throughout the entire incident. Furthermore, Taylor testified that, shortly before the crash, he was distracted by the headlights of a motorist in his rearview mirror. Despite this distraction, however, Taylor claimed that his driving was not affected to any significant degree. Finally, although Taylor did remember seeing a sign warning of an upcoming curve, he testified that he did not realize that he had entered the curve until his car was airborne. Because he thought he was on a straight away, at no point did Taylor brake or slow down prior to leaving the pavement. Regardless of whether Taylor was asleep, distracted by headlights or simply experienced a momentary lapse of attention, there is no doubt that it was his negligence which set the vehicle in its path off the road. Consequently, the trial judge correctly determined that Taylor was at fault in causing the accident.
Having affirmed the trial judge's findings of fault on the part of both DOTD and Taylor, next we must determine whether the trial judge was clearly wrong in allocating 75% of the fault to DOTD and 25% to Taylor. We hold that he was.
In his reasons for judgment, the trial judge based his percent allocation of fault to DOTD on the erroneous conclusion that DOTD was liable to plaintiffs for its negligence both in failing to maintain a proper shoulder slope and in failing to conform the abandoned driveway to the shoulder. Because we have already held that DOTD is not liable for any contribution the driveway may have had to plaintiffs' harm, DOTD's percentage of fault can be based only on its failure to maintain a proper shoulder slope. The trial judge erred in holding otherwise.
In re-apportioning fault, we must consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). In this case, it was the negligence of Taylor, in letting his tires leave the pavement, which set the accident in motion. From that point, Taylor's vehicle was pulled off the road and into a ditch by DOTD's excessively sloped shoulder. Together, therefore, the negligence of both Taylor and DOTD caused the harm occasioned by plaintiffs. The trial judge analogized the circumstances in this case to those in Campbell v. Dep't of Transp. & Dev., 94-1052 (La. 648 So.2d 898 where an errant driver veered across the highway and collided with a concrete bridge abutment, killing one of his passengers and injuring the other. In Campbell, the evidence demonstrated that, had guardrails been in place, the vehicle would not have collided with the bridge abutment and the force of the impact would have been reduced by 80% or more. Hence, plaintiffs injuries would have been significantly reduced if not totally prevented. In the instant case, it is clear that DOTD should have been aware that its failure to maintain the shoulder along Hwy 10 might eventually result in a serious accident. Furthermore, DOTD alone had the capacity to ameliorate the dangerous condition. However, contrary to the circumstances in Campbell, where the trial judge was able to make an unequivocal determination regarding the harm-preventative effect of guardrails, the evidence in this case is insufficient to support a finding that, given a properly sloped shoulder, plaintiffs' injuries would have been substantially altered either in type or degree. Consequently, we hold that DOTD is responsible for no more than 25% of the fault. Likewise, although Taylor was no more at fault in letting his vehicle stray off the road than was the *1246 driver in Campbell, when compared to DOTD's fault in this case, we hold that Taylor's fault can be apportioned at not less than 75%. Accordingly, we reduce DOTD's fault from 75% to 25%, which is the highest amount the trial judge could have reasonably allocated to DOTD. Clement v. Frey, 95-1119, 95-1163, p.8-10 (La.1/16/96), 666 So.2d 607, 611-12.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed in part and reversed in part. All costs are assessed equally between the parties.
JOHNSON, J., concurs.
VICTORY, J., dissents in part and assigns reasons..
VICTORY, Judge, concurring in part and dissenting in part.
To hold DOTD liable, the plaintiffs had the burden of proving "the defect was a cause in fact of [their] injuries." Lee v. State Through Dept. of Transp., 97-0350 p. 4 (La.10/21/97); 701 So.2d 676, 678. A defendant's conduct is a cause-in-fact of the harm only if it is a "substantial factor" in bringing about the harm. Graves v. Page, 96-2201 p. 8 (La.11/7/97); 703 So.2d 566, 570 (citing Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, § 4-3 at 86-88 (1996)). A thorough analysis of the evidence the plaintiffs presented leads to the conclusion that the plaintiffs failed to prove that the shoulder slope was a substantial factor in either the accident or the injuries sustained.
Reginald Taylor, the driver of the vehicle, gave the following testimony as to how the accident occurred:
Q: And then in the curve where the accident occurred, is that where you ran off of the road?
A: Yes, sir. WeObviously, by not seeing the curve, I just went straight off the road. I didn't see a curve.

* * * * * *
Q: Did you have any particular reason before you ran off of the road to apply your brakes or slam on brakes?
A: No, sir, I thought that I was on a straight away.

Q: As soon as you realized that you had run off of the road, did you attempt to react to do anything to alter your course or stop your car or anything like that?
A: It happened too fast. I guess looking at it now, I wish I could have, but there's no way that I could have done anything.

Q: All right. Would it be fair to say that within perhaps a second after you ran off of the road that you felt your vehicleyou felt what you referred to as the bump and then you felt your vehicle going air borne?
A: Yes, sir.
Q: Obviously if you're air borne, you can't alter your course and you can't apply the brakes?
A: No, sir.
[emphasis added]
According to Taylor's testimony, he steered his car off of the road because he did not realize the road curved at the point of the accident; he thought he was on a straight away. Once off of the road, he never swerved, applied the brakes, or took any other action to avoid this accident. Yet the majority relies on the testimony of plaintiffs' experts, Duaine Evans and James Justice, to find that "Taylor's vehicle was pulled off the road and into a ditch by DOTD's excessively sloped shoulder." But Taylor never testified that the shoulder pulled him off of the highway. To the contrary, he said he drove off of the highway because he failed to realize the road curved. Assuming the plaintiffs' experts are correct in finding that the slope of this shoulder is defective, Taylor's testimony establishes that he simply drove straight in a curve, and was not pulled off the road by the shoulder. Further, their conclusion that "Taylor had virtually no chance of recovery from the moment his front tire hit the shoulder," is irrelevant. Taylor never attempted to re-enter the roadway once he left it, so his potential chance of recovery had no bearing on the accident.
Even so, the trial court correctly concluded that even without the excessive slope of the shoulder "there probably would have been an accident anyway." So "but for" the excessively sloped shoulder, the accident still would have occurred. How, then, is it possible *1247 to conclude that the shoulder is a cause-in-fact of the harm suffered in this case? The trial court did so by using the following analysis:
A distinction must be made between the cause-in-fact of the accident and the resulting harm which was caused by the accident. In this case if the cross-slope had not been excessive and if the connecting abandoned driveway had not been present, there probably would have been an accident anyway, but it probably would have been less severe.

[emphasis added]
Thus, the trial court concluded that the shoulder and the abandoned driveway were a cause-in-fact only because the accident in this case would have been less severe. This analysis, where the cause-in-fact is measured by looking at the resulting harm, has been used by this Court in the past. See Campbell v. Louisiana Dept. of Transp. & Development, 94-1052 pp. 5-8 (La.1/17/95), 648 So.2d 898, 901-903.
In reapportioning the fault in this case, the majority notes the trial court's reliance on Campbell. Yet the majority specifically rejects the trial court's analysis by finding that "the evidence in this case is insufficient to support a finding that, given a properly sloped shoulder, plaintiffs' injuries would have been substantially altered either in type or degree." The majority then uses the distinction between Campbell and this case to find DOTD only 25% at fault.
But what the majority fails to realize is that instead of using this distinction to lower the fault of DOTD, this distinction frees DOTD from liability altogether. If "but for" the shoulder the accident would have happened anyway (as the trial court found), and "but for" the shoulder the plaintiffs' injuries would have been the same (as the majority states), the shoulder is simply not a cause-in-fact of either the accident or the plaintiffs' injuries. I respectfully dissent from the portion of the opinion which holds DOTD 25% at fault.
NOTES
[*] Justice Knoll, not on panel. Rule IV, Part 2, § 3.
[1] Plaintiffs amended their petitions to name as a defendant Louisiana Insurance Guaranty Association, the statutory successor of Champion Insurance.
[2] Also named as defendants were Edmund Taylor (Reginald's brother) and his insurer, Louisiana Indemnity Company. These parties and Reginald Taylor were subsequently dismissed.
[3] 97-0033 (La.9/19/97), 701 So.2d 139. The exhibits filed during trial were lost at some point prior to the record being lodged in this court. Therefore, this opinion is based on the record without the benefit of the exhibits.
[4] To calculate the slope of the roll over, James Justice testified that the slope of the shoulder is added to that of the travel lane.