770 So.2d 492 (2000)
Christine SCOTT, Individually and as Natural Tutrix of the Minors, Kelly Renee Scott and Katie Olivia Scott
v.
Angela H. PYLES, Andy Pyles, Illinois National Insurance Co., Ltd., Farm Bureau Casualty Insurance and Ford Motor Company.
No. 99 CA 1775.
Court of Appeal of Louisiana, First Circuit.
October 25, 2000.
*494 Edward J. Walters, Keith P. Richards, John L. Dugas, Baton Rouge, Counsel for *495 Christine Scott, Individually and as Natural Tutrix of the Minors, Kelly Renee Scott and Katie Olivia Scott.
H. Evans Scobee, Keith C. Armstrong, Henry D. Salassi, Baton Rouge, Counsel for Defendants/Appellants State of Louisiana, Department of Transportation and Development.
Before: LeBLANC, KUHN, and GRANT,[1] JJ.
KUHN, J.
Appellant-defendant, Department of Transportation and Development ("DOTD"), appeals the trial court's judgment finding it thirty percent at fault and awarding damages to plaintiff-appellee, Christine Scott, individually and in her capacity as the confirmed tutrix of her two minor daughters, Kelly and Katie Scott.[2] This suit involves damage claims relative to the personal injuries sustained by Christine Scott and the death of her husband, Mitchell Scott, in an automobile accident. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND
On May 2, 1992, Mitchell and Christine Scott attended a function sponsored by Mitchell's employer. After they left the employer-sponsored function, the Scotts joined Christine's sister at Shoney's for dinner. At approximately 1:50 AM, in the early morning hours of May 3rd, under foggy weather conditions, Mitchell Scott, accompanied by Christine, was driving his employer-owned automobile in an easterly direction on Highway 30 in Ascension Parish at or slower than the posted speed limit. When he attempted to cross through the intersection of Highway 30 with Purpera/Hodgeson Roads,[3] a Ford Explorer driven in a southerly direction by Angela Pyles collided into the Scott automobile. Ms. Pyles was intoxicated. As a result of the collision, Mitchell Scott died from the injuries he sustained. Christine Scott survived the automobile accident, although she sustained numerous personal injuries.
Christine Scott filed a petition for damages individually and on behalf of her minor daughters, Kelly and Katie, naming Angela Pyles and her husband, Andrew, as well as DOTD, inter alia, as defendants.[4] On March 16, 1998, the Pyles were dismissed from the lawsuit upon reaching an amicable resolution of plaintiff's claims against them.
*496 A bifurcated trial on the merits was held solely on plaintiff's claims against DOTD. On September 4, 1998, the trial court issued written reasons for judgment concluding Angela Pyles was seventy percent at fault and DOTD was thirty percent at fault for plaintiff's damages. On January 7, 1999, a trial on the merits addressing the quantum of damages was held. By judgment signed on February 8, 1999, the trial court concluded the total damages of plaintiff were $3,485,580.75. DOTD was ordered to pay plaintiff the amount of $1,045,674.23, thirty percent of the total damages. From that judgment, DOTD suspensively appeals. DOTD asserts the trial court erred: (1) in concluding that the failure to install a flashing beacon at the intersection of Highway 30 and Purpera/Hodgeson Roads constituted an unreasonable risk of harm; (2) in finding that DOTD was a cause of plaintiff's harm; and (3) in awarding excessive amounts of damages.

II. DOTD'S LIABILITY
In order to hold DOTD liable for plaintiff's damages under the facts of this case, the trial court concluded that plaintiff sustained her burden of proving that: (1) DOTD had custody of the thing which caused plaintiff's damages; (2) the thing was defective because it had a condition which created an unreasonable risk of harm; (3) DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries. Jacobs v. City of Bunkie, 98-2510, pp. 1-2 n. 2 (La.5/18/99), 737 So.2d 14, 17 n. 2; Brown v. Louisiana Indem. Co., 97-1344, p. 3 (La.3/4/98), 707 So.2d 1240, 1242.
Pursuant to La. R.S. 48:21(A), DOTD has a statutory duty to "study, administer, construct, improve, maintain, repair, and regulate" the use of public highways and roads. As such, DOTD has a duty to maintain the public highways in a condition which is reasonably safe, and that duty is owed to persons exercising ordinary care and reasonable prudence. La. R.S. 48:21; Brown, 97-1344 at p. 3, 707 So.2d at 1242. This includes a duty with regard to signs and traffic signals along the road. Lee v. State Through Dep't of Transp. and Dev., 97-0350, p. 4 (La.10/21/97), 701 So.2d 676, 678. DOTD cannot, however, guarantee the safety of all travelers. Id. Nor can it be held responsible for all injuries resulting from any risk posed by the roadway or its appurtenances, only those caused by an unreasonable risk of harm to others. Id.
In Stobart v. State Through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La. 1993), the Louisiana Supreme Court explained the standard of review appellate courts must apply when reviewing the trial court's findings of fact:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). [The Supreme Court] has announced a two-part test for the reversal of a factfinder's determinations:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Stobart, 617 So.2d at 882. It must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. The issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. *497 Even though an appellate court may feel our own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id.

A. Custody
The parties do not dispute that DOTD maintained custody and/or control over the intersection of Purpera/Hodgeson Roads (parish roads) and Highway 30 (a state road).

B. Defect
DOTD focuses its appeal on the trial court's conclusion that the lack of an amber/red light flashing beacon at the intersection of Highway 30 and Purpera/Hodgeson Roads constituted an unreasonable risk of harm, urging that the finding is not supported by the evidence and, therefore, manifestly erroneous.
A vice or defect is some flaw inherent in the thing itself which creates an unreasonable risk of harm to another. Greenlee v. State, ex rel. Dep't of Transp. and Dev., 98-2522, p. 3 (La.App. 1st Cir.2/18/00), 753 So.2d 364, 366. The determination of whether something posed an unreasonable risk of harm is reviewed under the manifest error standard of review. Reed v. Wal-Mart Stores, Inc., 97-1174, p. 5 (La.3/4/98), 708 So.2d 362, 365; Greenlee, 98-2522 at p. 4, 753 So.2d at 366.
In its written reasons, the trial court stated:
The [subservient] Road in this case was Purpera. The trial testimony established that there were a high number of accidents at the intersection. There were enough accidents, according to the DOTD's own interdepartmental standard, to merit the installation of a flashing red beacon. Even after they were urged by the City of Gonzales to install additional traffic controls, the DOTD failed to take action to correct the dangerous condition of the intersection. This Court finds that the lack of a flashing beacon on Purpera Road did constitute an unreasonable risk of harm to prudent drivers....
The evidence presented at trial included testimony by both plaintiff's and DOTD's respective experts, each accepted in the area of highway design and civil engineering, regarding the placement of flashing intersection controls.[5] The experts agreed that with an amber/red light flashing beacon, the flashing amber light was a caution to the motoring public traveling on a favored roadway of a hazardous situation or danger ahead. A flashing red light, according to the collective testimony of the experts, was to advise the motoring public traveling on the subservient roadway to stop and maintain a proper lookout with regard to the favored roadway. Additionally, the testimony of both experts established that, in general, intersectional collisions may be preventable with the installation of flashing beacons; however, the experts disagreed whether the installation of a flashing beacon at the intersection of Purpera and Highway 30 would have prevented the Scott/Pyles accident.
Both experts agreed that according to the Engineering Directives and Standards Manual ("EDSM"), which consists of standards, *498 directives and manuals and is prepared by the State, generally a location should have at least three accidents susceptible of correction by the installation of a flashing beacon in a one-year time period before an intersection control beacon would be installed. Although both experts acknowledged that the same EDSM warrant was tempered by the statement that the indiscriminate use of flashing intersection control beacons should be avoided as such use could reduce the effectiveness to where they are of little or no value, the record contains no evidence indicating where, if any, other amber/red flashing light beacon signals were located along Highway 30 or Purpera/Hodgeson Roads on the day of the Scott/Pyles accident. The experts presented conflicting opinions on whether three accidents susceptible of correction had occurred at that intersection in the years preceding the May 3, 1992 accident.
James R. Clary, Sr., plaintiff's expert, noted that roadways of Purpera and Hodgeson are not directly aligned, with Hodgeson situated somewhat to the east of Purpera Road south of Highway 30. This expert testified that in his opinion three accidents susceptible of correction had occurred on October 11, 1987, November 11, 1987 and March 26, 1988, thereby satisfying the EDSM warrant for the installation of flashing beacons. In the October 11, 1987 accident, the driver traveling north on Purpera, who was cited with driving while intoxicated, stated that he did not see the "STOP" sign. In the other two accidents, the drivers traveling on Purpera were cited with failure to yield, with notations by the respective investigating police officers that each driver had been inattentive or distracted.
Clary opined that the intersection of Highway 30 and Purpera/Hodgeson Roads as it existed on May 3, 1992, was unreasonably dangerous. According to Clary, a flashing red light can be seen from a considerable distance, especially under the foggy weather conditions and at the time of night of the Scott/Pyles accident. Clary explained that a flashing red light is a positive visual cue of danger ahead, which is far more likely to be noticed than the passive "STOP" sign. Plaintiff's expert stated that the blinking amber light serves to put the driver on the favored roadway on notice that he should proceed with caution because there is danger ahead.
DOTD expert, Jack Humphries, opined that the intersection of Highway 30 with Purpera/Hodgeson Roads was not unreasonably dangerous. He disagreed with Clary's conclusion that three accidents susceptible of correction by the installation of a flashing beacon had occurred between October 1987 and March 1988. Humphries testified that because the driver in the November 11, 1987 accident had actually stopped at the "STOP" sign on Purpera Road before entering the intersection, he did not agree with Clary that the accident was one which was susceptible of correction. He acknowledged that a flashing beacon was more likely to catch the attention of a driver than a passive "STOP" sign, but noted that if a driver actually stopped for the "STOP" sign, the purpose of the flashing red light had already been served. It was his opinion that the presence of the flashing amber light for the driver on Highway 30 would not have been of any use, suggesting that at the rate of 50 MPH a cautionary warning would not have prevented the November 11, 1987 accident from occurring.
Humphries explained that the EDSM, upon which Clary relied, was developed to augment the Manual on Uniform Traffic Control Devices ("MUTCD"). According to Humphries, among the provisions of MUTCD is the statement that the decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. The DOTD expert noted that while MUTCD provides standards for design and application of traffic control devices, by its express terms, it is not a substitute for engineering judgment. Humphries testified *499 that it was the express intent of the MUTCD that its provisions be standards for traffic control devices installation, but not a legal requirement for installation.
In addition to the expert testimony, a resolution passed by the City of Gonzales was introduced into evidence. The resolution, signed by Mayor John A. Berthelot on October 23, 1989, requested that DOTD assess dangerous and congested traffic conditions at the intersection of Highway 30 with Purpera/Hodgeson Roads. Mayor Berthelot testified that the request was denied.[6]
Although the experts' testimony conflicted on whether three accidents susceptible to correction by the installation of an amber/red light flashing beacon had occurred within a one-year period, the trial court chose to accept that of plaintiff's expert. While we might have concluded differently had we been the triers of fact in this case, we are mindful that reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review where conflict exists in the testimony. Having found a reasonable factual basis exists to support the trial court's finding that the lack of a flashing amber/red light beacon at the intersection of Highway 30 and Purpera/Hodgeson Roads constituted an unreasonable risk of harm, we are constrained under our standard of review to uphold that finding. Accordingly, we cannot say that the factual finding is manifestly erroneous or clearly wrong.

C. Cause in Fact
Cause in fact is generally a "but for" inquiry; if plaintiff probably would not have sustained the injuries but for defendant's substandard conduct, such conduct is a cause in fact. Hutzler v. Cole, 93-0468, p. 9 (La.App. 1st Cir.3/11/94), 633 So.2d 1319, 1325, writ denied, 94-0850 (La.5/13/94), 637 So.2d 1070. In other words, the inquiry is whether defendant contributed to plaintiff's harm. An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the "substantial factor" test. Id. Under this test, cause in fact is found to exist when defendant's conduct was a "substantial factor" in bringing about plaintiff's harm. Id. When multiple causes are alleged, defendant's conduct is a cause in fact when it is a factor in generating plaintiff's harm. Id. The question of whether the defendant's conduct is a cause in fact is a factual inquiry to be determined by the trier of fact. Id.
The parties stipulated that when confronted with the "STOP" sign on Purpera Road, Angela Pyles did not stop as directed. The expert testimony established that the purpose of the flashing red light on a subservient roadway, such as Purpera Road, was to advise the driver to stop and maintain a lookout for traffic on the favored roadway. As noted above, Clary testified that the presence of a flashing red light is a positive visual cue of danger ahead, which is far more likely to be noticed than the passive "STOP" sign. Additionally, DOTD expert Humphries acknowledged that the blinking red light of the amber/red light flashing beacon is designed to more readily capture the attention of a driver than the passive traffic control "STOP" sign. The DOTD expert stated that the active flashing red light device would more probably than not draw the attention of a motorist on the subservient roadway than would a "STOP" sign. Insofar as the flashing amber light for the drivers utilizing the favored roadway, both experts agreed such a warning *500 advises drivers of a hazardous or dangerous situation. Because the evidence establishes nothing other than Mitchell Scott was a prudent and safe driver, we must assume that had he been duly alerted by a flashing amber beacon, he would have heeded the warning and driven in a more cautionary manner. Given the expert evidence, mindful that the City of Gonzales had alerted DOTD of its concern about the safety of the motoring public at this intersection in 1989 and the established fact in this case that Pyles did not stop for the posted "STOP" sign, a reasonable factual basis exists to support the trial court's implicit factual finding that but for the lack of the flashing beacon, plaintiff probably would not have sustained the injuries. Applying the substantial harm test, the trial court's implicit finding that the lack of a flashing beacon for the motoring public at the intersection of Purpera/Hodgeson Roads with Highway 30 was a factor in generating plaintiff's harm is likewise supported with an evidentiary basis and, therefore, not clearly wrong or manifestly erroneous.
DOTD would have us look no further than the negligence of Angela Pyles in causing the accident which resulted in Mitchell Scott's death. The evidence in this record establishes that the intoxicated condition of Angela Pyles as well as the lack of a flashing beacon to alert drivers on both the favored and the subservient roadways combined to cause the harm to plaintiff. See Gibson v. State through Dep't of Transp. and Dev., 95-1418, p. 9 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1003, writs denied, 96-1862, 96-1895 and 96-1902 (La.10/25/96), 686 So.2d 373, 374. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. Campbell v. Louisiana Dep't of Transp. & Dev., 94-1052, p. 7 (La.1/17/95), 648 So.2d 898, 902.

D. Legal Cause
DOTD strenuously urges that the lack of presence of a flashing beacon at the intersection did not constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances because Angela Pyles was an intoxicated driver at the time of the accident. We construe this assertion by DOTD to challenge the trial court's implicit conclusion that the lack of a flashing beacon at the intersection of Highway 30 and Purpera/Hodgeson Roads on the day of the Scott/Pyles accident was a legal cause of plaintiff's harm.
Legal cause is synonymous with defendant's breach of a duty that extends to protect plaintiff from the type and manner of harm of which she complains. Jones v. Johnson, 572 So.2d 150, 156, n. 10 (La.App. 1st Cir.1990), writs denied, 576 So.2d 519 (La.1991). Whereas the question of cause in fact involves a factual determination, the determination of legal cause is a purely legal question. Todd v. State, Dep't of Social Services, Office of Community Services, 96-3090, p. 6 (La.9/9/97), 699 So.2d 35, 39. The legal cause or scope of duty inquiry is fact sensitive and ultimately turns on a question of policy as to whether a particular risk falls within the scope of the duty. Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). To find DOTD liable for an unreasonable risk of harm, the imperfection or irregularity in the thing must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. See Netecke v. State ex rel. DOTD, 98-1182, p. 8 (La.10/19/99), 747 So.2d 489, 495. Whether DOTD breached its duty to the motoring public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on the facts and circumstances of the case. Lee, 97-0350 at p. 4, 701 So.2d at 678.
One may agree with DOTD that its duty to maintain the public highways in a safe condition does not require it to ensure an *501 intoxicated driver stop at a "STOP" sign.[7] However, in this case, the trial court found as a matter of fact that the lack of a flashing beacon created an unreasonable risk of harm. Both experts testified and agreed that the EDSM used by DOTD discussed installation of a flashing beacon once three accidents occurred which would have been preventable had the beacon existed at an intersection. Insofar as causation may be at issue, the testimony of both experts should be construed as a positive statement that intersectional collisions may be preventable with the installation of flashing beacons. Given these facts, it is clear to us that it is to the prudent motoring public using ordinary care as they traveled along Highway 30 that DOTD owed a duty to install a flashing beacon at the intersection. Mitchell Scott, whom the record establishes was a prudent driver exercising ordinary care in the early morning hours of May 3rd and completely free from fault, was such a driver, and DOTD's duty to maintain Highway 30 in a safe condition clearly extended to him.
The facts under review show the City of Gonzales requested that traffic controls be installed at the intersection citing "dangerous and congested traffic conditions," approximately three years before Mitchell Scott's death. In addition, that there is no evidence of the number of flashing beacons along either Highway 30 and/or Purpera/Hodgeson Roads, so as to demonstrate indiscriminate use of this type of intersectional traffic control, convinces us that the duty DOTD owed the motoring public to maintain the state's highways in a safe condition extended to this plaintiff. DOTD's duty to install a flashing beacon at an intersection as specified in the EDSM was one which was owed to Mitchell and Christine Scott, and DOTD is not relieved from that duty simply because the driver utilizing the subservient roadway was intoxicated. We note there is no evidence in the record, save speculation, that alcohol consumption prevented Pyle from stopping at the "STOP" sign.
The presence of a flashing amber light for Highway 30 would have heightened Mitchell Scott's awareness of the potential danger the intersection with Purpera/Hodgeson Roads held and, perhaps, caused him to drive in a manner which would have allowed him to advert the collision with the Pyles vehicle. More importantly, DOTD's duty to maintain the public highways in a safe condition included the real risk that drivers would not stop at the "STOP" sign posted on Purpera Road. We find no error in the trial court's implicit conclusion that the unreasonable risk of harm created by the lack of a flashing beacon extended to this plaintiff.
Because DOTD does not challenge the trial court's allocation of thirty percent fault to it,[8] and having found no error in the conclusion that DOTD is liable in part to plaintiff for her damages, we turn now to the contentions relative to the awards of damages.

III. QUANTUM OF DAMAGES
The trier of fact is given much discretion in the assessment of damages. La. C.C. art. 2324.1. Upon appellate review, damage awards will be disturbed *502 only when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La. 1979). In reviewing quantum, if the award constitutes an abusive of discretion, it is not disregarded, but rather is reduced to the highest amount or raised to the lowest amount within the reasonable range of discretion. Powell v. Regional Transit Authority, 96-0715, p. 10 n. 10 (La.6/18/97), 695 So.2d 1326, 1332 n. 10.

A. General Damages
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Without contending that the record lacks a reasonable factual basis to support the trial court's award of general damages to Christine Scott, DOTD simply urges that the amount awarded was too much and, as such, constituted an abuse of discretion. The trial court awarded Christine total general damages in the amount of $600,000.00, specifying that $150,000.00 were attributable to her facial disfigurement and $450,000.00 were for the remainder of her general damages.
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 437. The factors to be considered in assessing quantum for pain and suffering are severity and duration. Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 8 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 357.
In its written reasons for judgment, the trial court stated:
Mrs. Scott's mandible was fractured. She suffered facial lacerations, and multiple [intra-oral] lacerations as well. She sustained lacerations to the upper lid, nasal labial fold, upper and lower left eyelid, and the scalp. In addition to her facial injuries, she suffered contusions and lacerations to her legs and thighs, elbow and arms. Her wounds were surgically debrided ... and sutured. A plate was put in her jaw and her jaws were wired together. She was only able to eat liquids ... via syringe. She also required extensive dental work to repair damaged teeth.
The dental work entailed, among other things, the placement of two teeth implants in the lower left side of her mouth. She required several root canals as a result of the trauma sustained to her teeth in the accident and required placement of six crowns for her teeth and the implants.
Christine Scott was temporarily blind after the accident. Although her vision was subsequently restored, she continued to have difficulty with dry eye due to scar tissue development in her lower left eyelid *503 for several years post-accident. One week after her initial discharge from the hospital, Christine returned with severe back pain and an inability to urinate. She was diagnosed with a bladder spasm and back pain attributable to lumbar contusions she sustained in the accident.
Christine Scott testified that she was in excruciating pain as a result of her injuries, especially in her jaw. She found the physical therapy she underwent to assist her in opening her mouth to be overwhelmingly painful. Bruises covered her body from head to toe. She testified that due to an injury on her leg, she was unable to walk. Family and neighborhood friends assisted her in round the clock shifts. Due to her injuries, her doctors concluded it was best if she did not attend Mitchell's funeral, which caused her enormous guilt. Each of her doctors and dentists described the enormous pain Christine endured as a result of both her injuries and the subsequent treatment for those injuries. Christine suffered from frequent and intense headaches, continuing through the date of trial. Additionally, she became depressed and was treated by a psychiatrist.
In light of the injuries Christine Scott suffered from, and mindful of the inferences of pain and suffering the trial court made, we find no abuse in the trial court's award of $450,000.00 in general damages for all injuries, except the permanent disfigurement. For the permanent facial scarring Christine has, the trial court made a separate award of $150,000.00. DOTD does not assert any specific contentions with this award, instead maintaining the total award of $600,000.00 is an abuse of discretion.
Christine was treated by plastic surgeon, Dr. Ann Reilley, on the day of the accident. Dr. Reilley cleaned up the facial wounds, removing glass from the cheek, and suturing lacerations to the eyelid and cheek. Christine sustained a bad injury on the left side of her lip, from which tissue had to be excised. She has severe scarring due to the absence of skin and a tendency for hypertrophic scarring. Dr. Reilley explained that a hypertonic scar is a thick or raised one; it is unsightly and more noticeable. Christine was referred to a makeup artist to learn some techniques to camouflage the scars on her cheek and lip. Due to under-pigmentation in the healing process, areas where the skin is lighter than her normal skin color, Christine was tattooed to create a more even colored appearance. According to the expert plastic surgeon, the process is an injection of color into the skin which is the same process performed to create ordinary tattoos.
The main cosmetic concern Christine was worried with was the tightness of her upper left lip. Dr. Reilley testified that it was caused because of a lack of skin and missing tissue. Lip reconstruction was undertaken, where tissue was removed from near the center of Christine's bottom lip and placed into her top lip. Because the flap was too bulky, several revisional surgeries, consisting of direct excisions of the tissue and skin of the upper lip, were performed. Nevertheless, Christine has notable scarring on both her left cheek and the left side of her upper lip. Dr. Reilley indicated that Christine lost some of the normal anatomical landmarks on her lip. The normal part of the cupid's bow on the left side and the normal-like nasal labial-type fold were lost. The obvious thing, according to Dr. Reilley, is that there is just too much upper lip; the distance between the nose and the corner of the mouth is notably damaged.
Although Dr. Reilley addressed her treatment of the physiological damage to Christine's face, she also noted that Christine was terribly self-conscious about her lip. Christine indicated to her that every time she looked in the mirror, it was very painful. This sentiment was evident in Christine's testimony regarding the appearance of her face. She described her face as ugly. According to Dr. Reilley, Christine was reminded of the accident and of the loss of her husband every time *504 she saw herself. She felt uncomfortable about meeting new people or being around other people. Dr. Reilley testified that more than anything, Christine just wanted to be restored to her pre-injury condition. Dr. Reilley could not achieve that for her patient.
Whether we consider the trial court's itemized awards of $150,000.00 for the permanent facial scarring of Christine Scott and $450,000 .00 for all other general damages individually, or simply the total award of $600,000.00 in general damages, there is no abuse of the trial court's much discretion under the facts of this case.

B. Wrongful Death Claims
The elements of damage for a wrongful death action are loss of love, affection, companionship, and support and funeral expenses. Gibson, 95-1418 at p. 14, 674 So.2d at 1006.

1. Christine Scott
The trial court awarded Christine Scott $750,000.00 for the wrongful death of her husband. DOTD contends the award is abusively high.
In addition to Christine's testimony, that of her daughters, Kelly and Katie, established Christine and Mitchell had a close and loving relationship. Collectively, they characterized the Scott marriage as a very good one. Christine was dependent upon her husband, both financially and emotionally. She described her husband as a family man, who maintained a busy schedule, but nevertheless was involved in the details of their family life. According to Christine, she did not want to live after she learned of her husband's death, and even the knowledge of her daughters' need for a mother did not matter to her.
After referral from a grief counselor, Christine began a three-year treatment for depression with a psychiatrist. Dr. Navin Patel, who treated Christine's depression, testified that the nature of the events, guilt she was consumed with (reasoning that if she had not convinced her husband to attend the employer-sponsored event the evening of his death, he would somehow still be alive) and the surgeries for her facial injuries caused Christine to constantly re-live the trauma of the accident. Dr. Patel explained that having lost a spouse that she was very close to and dependent upon, coupled with the facial disfigurement, made Christine's experience traumatic for her.
Although he did not characterize her as suicidal, Dr. Patel saw a despondency in Christine that concerned him. She was unable to participate and cope in her role as a single parent. In addition to a voluntary commitment to an inpatient grief program at Our Lady of the Lake Hospital, Christine participated in an outpatient program for grief counseling through the hospital. Subsequent to her hospital care, and having been prescribed Prozac, Christine began to make progress. Her relationships with her children improved. Dr. Patel, who sold his practice toward the end of Christine's treatment, believed that she was well on her road to recovery.
While the record establishes that Christine grieved deeply after losing her husband, she was also very emotionally effected by her own injuries, especially the disfigurement to her face. We find the trial court abused its discretion in awarding Christine Scott $750,000.00 for the wrongful death of Mitchell Scott. Reducing the wrongful death award in favor of Christine to the highest amount a reasonable trier of fact can award in light of the evidence in this case, we conclude the amount of $500,000.00 is an appropriate award. Accordingly, we amend the trial court's judgment from $750,000.00 to $500,000.00 for Christine's wrongful death damages.

2. Kelly and Katie Scott
The trial court awarded each of the Scott daughters wrongful death damages. Kelly was awarded $750,000.00 and Katie's award was $500,000.00.
*505 Under Louisiana law, amounts recoverable in a wrongful death action for loss of care, guidance, and affection of the deceased may differ among the plaintiffs on the basis of differing degrees of affection which existed between the deceased and the different plaintiffs or differing degrees of guidance needed by minor plaintiffs. Archie v. Board of Sup'rs of Louisiana State University, 543 So.2d 1348, 1353 (La.App. 1st Cir.1989).
Both Kelly and Katie Scott testified. Kelly was 13 and Katie was 10 on the day of the accident. According to both daughters, Kelly was very close to her father. Mitchell had sponsored her baseball team at school. He attended club functions and events in which she was involved. Both Scott daughters noted the special bond between Kelly and her father, describing her as a "daddy's girl." Kelly stated that after her father's death, everything was different. Besides the effect on her mother and her withdrawal from their family's life, Kelly grieved her own loss.
While the Scott sisters acknowledged that Katie's relationship with their father was not as close as Kelly's, due in part to her younger age, the impact of the loss was nevertheless devastating to the ten year old. Despite her young years at the time of her father's death, Katie recalled that Mitchell attended activities involving her, taking a "ton of pictures" of her. Katie testified that she missed her father and his absence was especially apparent to her at dance competitions. She stated that seeing other dancers with their fathers present, obviously proud of their daughters, made her wish her father were there.
In light of the evidence in this record, we find the trial court's awards to each of the Scott sisters for the wrongful death of their father is a clear abuse of its discretion. Reducing the awards to the highest amounts within the reasonable range of discretion, we conclude $500,000.00 is the most a reasonable trier of fact can assess to Kelly Scott for the wrongful death of her father. We find the amount of $400,000.00 is the most a reasonable trier of fact can assess to Kelly Scott under the facts established in this case. Accordingly, the trial court's judgment is amended from $750,000.00 to $500,000.00 for Kelly Scott's wrongful death damages and from $500,000.00 to $400,000.00 for Kellie Scott's wrongful death damages.

C. Loss of Consortium
The trial court awarded each of Christine and Mitchell's daughters $100,000.00 for the loss of consortium damages each suffered as a result of their mother's injuries.
An award for loss of consortium is properly made where there has been some measurable or compensable loss, such as loss of love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity. Haley v. McManus, 593 So.2d 1339, 1344 (La.App. 1st Cir.1991). The elements of a minor child's claim for loss of service and society are essentially the same without, of course, the sexual component. Higley v. Kramer, 581 So.2d 273, 282 (La. App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991).
The collective testimony of the Scott daughters established that Kelly assumed many adult responsibilities, especially in the care of Katie. Katie said of her older sister, "I know she took care of me...she was only 13 or 14, and she did a lot for me. She was the one that was there for me." Christine, Kelly, Katie and Dr. Patel all agreed that for a long time, Christine wanted nothing to do with her daughters. Christine rationalized her unavailability with the thought that her sister would tend to the girls. Katie testified candidly that she was very angry with her mother for the neglect brought about by Christine's emotional reaction to Mitchell's death. Katie was in counseling at the time of trial attempting to deal with her anger *506 at her mother's emotional abandonment. The younger Scott daughter noted that she did not feel that she could discuss her problems with her mother because of her mother's intense emotional response to the loss of Mitchell. In light of the loss of their mother's love and affection, endured simultaneously with the grief they felt with the loss of their father, we cannot say that awards of $100,000.00 to each is an abuse of discretion especially given the emotional unavailability of their mother during their formative and teenage years.

D. Loss of Financial Support
The trial court awarded plaintiff $808,206.50 for loss of past and future financial support from Mitchell Scott. On appeal, DOTD urges that the trial court abused its discretion by "blindly accepting" the numbers of plaintiff's economist over those of DOTD's economist.
The report of G. Randolph Rice, Ph.D. was submitted by plaintiffs. Rice noted that Mitchell Scott was born on August 26, 1955. Applying recent data from the Bureau of Labor Statistics, U.S. Department of Labor, Rice indicated that had the accident not occurred, Mitchell's future work-life expectancy from the date of trial was 18.7 years. Calculating Mitchell's past lost earnings based on his annual salary of $48,525.00, which included an amount for a $5,000.00 annual bonus that Mitchell received in 1992, Rice opined the past loss of support to the Scott family was $323,057.00. Using the same salary base, applying a 3.0 percent annual growth factor to reflect inflationary pressures, and a discount rate of 5.25 percent to offset that the Scott family would presently receive earnings Mitchell would not have earned until a future date, Rice concluded the present value of Mitchell's future earnings was $721,347.00. Thus, the combined total of the loss of support as calculated by Rice was $1,044,404.00. Rice used this total figure and adjusted it downward to reflect the personal consumption expenditures of Mitchell Scott arriving at a final amount of $886,413.00.
The report of Kenneth Boudreaux, Ph.D. was submitted by DOTD. Boudreaux used the same data base (U.S. Department of Labor, Bureau of Labor Statistics) as Rice but determined that Mitchell's life expectancy was 17.15 years from the date of trial. Utilizing the same annual salary of $48,525.00, applying annual growth factors ranging between 2.0 and 4.0 percent, discounting for present use by factors ranging from 4.35 to 5.0 percent, Boudreaux suggested the amount of $439,435.55 reflected the pre-tax future loss of support for Mitchell's spouse and his children through the age of 18. He indicated the amount of $448,959.06 reflected the pre-tax future loss of support for Mitchell's spouse and children through the age of 21. He additionally calculated the amounts of $236,482.93 and $248,725.86 as the pre-tax past loss of support for Mitchell's spouse and children, with the lesser amount reflecting the children through age 18, and the greater amount showing the children through age 21. Thus, Boudreaux opined that the total loss of support award to plaintiff was either $675,936.48 or $697,684.92, varying with the age of the children.
Based on this evidence, we cannot say the trial court's award of $808,206.50, falling between the conclusions of the economists, is an abuse of discretion.

IV. CONCLUSION
For the reasons stated, the trial court's judgment awarding total damages in the amount of $3,485,580.75 is amended to total damages in the amount of $2,885,580.75, reflecting the reduction from $750,000.00 to $500,000.00 for Christine, from $750,000.00 to $500,000.00 for Kellie and from $500,000.00 to $400,000.00 for their respective wrongful death damages. DOTD is therefore ordered to pay plaintiff the total amount of $952,241.88, reflecting the thirty percent allocation of fault attributable to DOTD. In all other *507 respects the judgment is affirmed. Costs of this appeal in the amount of $5,504.23 are assessed against the Department of Transportation and Development.
AFFIRMED AS AMENDED.
LeBLANC, J., concurs in part, dissents in part, and assigns reasons.
LeBLANC, J., Concurring in Part and Dissenting in Part.
After careful consideration of the record in this matter, I concur with the majority's opinion concerning the award of damages. However, I disagree with the percentage of fault allocated to DOTD. I find the issue sufficiently raised and properly before this court by virtue of DOTD's assignment of error raising the issue of causation. The issue of finding any fault encompasses the issue of finding some percentage of fault.
DOTD has a responsibility to consider the actions of inattentive or negligent drivers when making determinations about roadway safety. See Brown v. Louisiana Indemnity Company, 97-1344 (La.3/4/98), 707 So.2d 1240. The intersection in question was not equipped with a flashing beacon, which would have alerted Scott to proceed with caution because of the upcoming intersection. By comparison, we have a drunk driver failing to stop when confronted with a clearly marked "STOP" sign. Therefore, I would allocate to DOTD ten percent fault and ninety percent fault to Pyles.
Accordingly, I concur in part and dissent in part.
NOTES
[1] Judge Jo Ellen Grant of the 24th Judicial District Court is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although at the time the petition for damages was filed, the daughters of Christine Scott were minors, by the date of the trial on the merits, Kelly had obtained the age of majority. The record fails to establish that Kelly Scott was substituted as plaintiff upon reaching the age of majority, however, the parties do not raise any contentions with Kelly's status on appeal.
[3] The evidence established that north of Highway 30, the Ascension Parish roadway is named Purpera Road and to the south, it is named Hodgeson Lane. Purpera Road is also known as Painter Road, and at times is referred to as an avenue and a lane. In conformity with the trial court's reference in its written reasons as well as the parties' references in the pleadings, we refer to this roadway as "Purpera Road." Hodgeson Lane is also referred to as Hodgenson Lane at times in this record. For brevity, we refer to this roadway as "Purpera/Hodgeson Roads."
[4] On April 23, 1993, Christine Scott filed her first supplemental and amending petition for damages, replacing in its entirety an earlier petition, and naming DOTD as a defendant for the first time. In her later-filed pleading, in addition to the Pyles, Scott also named as defendants the Ford Motor Company, as the manufacturer of the Pyles vehicle, Illinois National Insurance Company, the insurer of the Pyles vehicle, and Louisiana Farm Bureau Casualty Insurance Company, the Scotts' uninsured/underinsured motorist insurer. Ford Motor Company was dismissed from the lawsuit after amicable resolution of the claims against it. Subsequent to its tender of its policy limits and court costs, Illinois National Insurance Company was released from this lawsuit. Louisiana Farm Bureau was dismissed by motion for summary judgment. The record also establishes that plaintiff settled a claim with Mitchell Scott's employer.
[5] Since the parties stipulated to the expertise of both Clary and Humphries, a formal hearing challenging the expertise of either witness's testimony to demonstrate a lack of a valid scientific connection to the pertinent inquiry, see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591-92, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), was neither requested nor conducted. See also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) (holding that Daubert's general "gatekeeping" obligation "applies not only to testimony based on `scientific' knowledge, but also to testimony based on `technical' and `other specialized' knowledge.") In light of the stipulation, the record lacks any evidence of the nature suggested in Daubert and its progeny, and we must therefore accept that the expertise of both these witnesses duly establishes the requisite valid scientific connection to the pertinent inquiry.
[6] Apparently, DOTD undertook a study which resulted in a conclusion that the intersection did not meet the congestion standards of the EDSM and, finding that very few accidents had occurred at that intersection, DOTD declined to install a flashing beacon signal as requested by the City of Gonzales. The record fails to establish, however, what, if any, engineering judgment was applied by DOTD relative to the EDSM warrant for installation of a flashing beacon based on three accidents susceptible to correction. Nor does the record establish that the warrant relative to congestion standards is of higher engineering priority than the warrant addressing installation of a flashing beacon.
[7] We note, though do not find dispositive, that the evidence in this record shows between 1987 and 1992, at least three collisions involving intoxicated motorists traveling on Purpera Road had occurred at this intersection with Highway 30. The Scott/Pyles accident was the fourth one.
[8] While DOTD requests in brief that this court adjust fault to find Angela Pyles ninety percent at fault and DOTD ten percent at fault, it neither assigned error to nor presented argument on the trial court's allocation of fault. The issue of fault allocation is not properly before us, see La. Uniform Rules-Courts of Appeal, Rule 2-12.4, however, we nevertheless note that based on the evidence in this record, the trial court's quantification of fault in this matter is not manifestly erroneous. See Gibson v. State, through Dep't of Transp. and Dev., 95-1418, p. 9 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1004, writs denied, 96-1862, 96-1895, and 96-1902 (La.10/25/96), 681 So.2d 373 and 374.